# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA
# FORT PIERCE DIVISION

| | |
|---|---|
| TOWNHOUSE RESTAURANT OF OVIEDO, INC. | Case No.: |
| | CLASS ACTION |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| NUCO2, LLC, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff TownHouse Restaurant of Oviedo, Inc. individually and on behalf of all persons or entities nationwide who are similarly situated, upon personal knowledge as to facts pertaining to it individually and upon information and belief as to all other matters, based on the investigation of its counsel, against the Defendants NuCO2, LLC, states as follows:

## I.      NATURE OF THE CASE

1.      Plaintiff brings this action to challenge NuCO2's widespread and systematic practice of overcharging its customers through a coordinated deceptive scheme.

2.      Plaintiff TownHouse Restaurant of Oviedo, Inc. is a small business that owns and operates a restaurant in Oviedo, Florida.  As part of its operations, Plaintiff purchases $CO_2$ and related equipment from NuCO2, LLC.  NuCO2 is a large beverage carbonation company that is wholly owned by Praxair, Inc., the largest industrial and medical supply company in North America, with more than $11 billion dollars in annual revenue.

1

3.     Like thousands of other small businesses across the country, Plaintiff buys its $CO_2$ and related equipment from NuCO2 pursuant to a standard, preprinted contract, a copy of which is attached as Exhibit A.  Notably, this contract is uniform among putative class members in all relevant aspects and contains a six-year term, which auto-renews for additional six-year terms. The primary purpose of the form contract is to established fixed monthly prices a given customer will pay NuCO2 for products and equipment.

4.     In violation of the form contract and of Florida law—which governs all claims in this litigation—NuCO2 has carried out a systematic deceptive scheme to charge its customers more than the agreed amounts.  NuCO2 enters into the agreements knowing that it will increase the promised prices without justification.  The contracts specifically restrict NuCO2's ability to increase prices to two discrete circumstances: 1) annually on the effective date of the contract (up to 5% or the amount of a specific inflationary index) or 2) within 15 days of sending a "Price Adjustment Notification."  NuCO2 does neither.  Rather, for years NuCO2 has carried out an automated price increase practice that increases price without the required notice and unrelated to the contractual effective date.  These increases are significant; over the standard six-year term customers are forced to pay as much as 30% more each month than what NuCO2 represented and agreed.

5.     In addition to assessing automated price increases on its customers, NuCO2 has also increased prices by imposing a fee it calls a "fuel surcharge/energy surcharge"[1] but which, in fact, has no relationship to its increased fuel costs. Rather, NuCO2 uses the fuel surcharge—in

---

[1] NUCO2 interchangeably refers to this fee as a "fuel surcharge," "energy surcharge," or "fuel surcharge/energy surcharge."  As the fee purportedly relates to the increased cost of diesel fuel, and as NUCO2 has traditionally referred to the fee as a "fuel surcharge" in its SEC filings, Plaintiff will use that term throughout this complaint to refer to this fee.

intent and effect—as a hidden price increase. The fuel surcharge bears absolutely no relation to NuCO2's actual increased fuel or energy costs and NuCO2 does not use the proceeds from the energy surcharge to offset such costs.  In fact, NuCO2 includes any fuel or energy costs it might incur in delivering its products and service through the standard rates it charges customers.  NuCO2 simply uses the fuel surcharge to generate extra profit at its customers' expense, all the while deceiving customers into believing that the fee is a legitimate charge directly related to specific increased costs it incurs.

6.      NuCO2's conduct is a violation of the Florida Deceptive and Unfair Trade Practices Act, a breach of contract, and a violation of the duty of good faith and fair dealing that underpins those contracts.

7.      Further, this case presents a prototypical situation for class treatment. NuCO2's conduct—including all relevant practices, deception, representations, and omissions—is uniform among all customers.  Plaintiff and all class members entered into the exact same form agreement with NuCO2.  The agreement with Plaintiff and all class members mandates that uniform Florida law applies to all class members' claims.  The application of shared law to a common course of conduct will determine liability for the classes as a whole, ensuring that the rights of thousands of small businesses are vindicated through the efficiency of a single trial.

## II.  JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $5,000,000,[2] the proposed classes consists of

---

[2] NuCO2 has more than 170,000 customers, the majority of which are assessed the automated price increases and fuel surcharges.  NuCO2 has carried out these practices for more than four years. Plaintiff, upon information and belief, conservative estimates that there is more than $65,000,000 at issue in this litigation.

more than 100 members, and minimal diversity exists.

9.     This Court has personal jurisdiction of NuCO2 because NuCO2 has its corporate headquarters in Stuart, Florida, is authorized to do business and in fact does business in this district, the specific conduct at issue in this case originated in and emanated from this district, and NuCO2 could reasonably anticipate litigation in this district under traditional notions of fair play and substantial justice.

10.    Venue is proper in this Court under 28 U.S.C. § 1391 and the Court's Local Rules. NuCO2's corporate headquarters is in Stuart, Florida, located in the Fort Pierce Division of the Southern District of Florida.  The conduct giving rise to Plaintiff's claims and to the claims of each putative class member in the proposed class originated in and emanated from NuCO2's corporate headquarters.

### III.    PARTIES

11.    Plaintiff TownHouse Restaurant of Oviedo, Inc. is a Florida Corporation with its principal place of business in Oviedo, Florida.

12.    Plaintiff's experience with NuCO2 is typical of the classes in all relevant aspects. Plaintiff entered into the form contract at issue with NuCO2 in April 2015.  Since that time, NuCO2 has unilaterally and unlawfully implemented automated price increases that affected Plaintiff on at least four separate occasions.  None of these increases complied with the contractual terms; none were "Annual Price Increases" on the date and of the amount allowed, none were Price Adjustment Notification increases.  The direct and proximate result of these unlawful, deceptive, and unfair automated price increases is that Plaintiff has been damaged by paying more for equipment and products than agreed.  For example, NuCO2 agreed to provide a bulk $CO_2$ tank to Plaintiff for $58.00 a month.  Through unlawful automated price increases, by 2019—less than 2/3 the

contractual term—NuCO2 now charges Plaintiff $80.71 per month for this equipment. That is an increase of nearly 40%. The other prices set by contract for liquid $CO_2$ and the carbonation system which uses it have similarly increased over this time.

13.     Plaintiff's experience with the fuel surcharge charged by NuCO2 is similarly typical of that of the class. Each time NuCO2 delivered product to Plaintiff, at least seven times to date, NuCO2 unilaterally assessed the standard fuel surcharge and Plaintiff paid that fee. NuCO2 represents this fee to be a "fuel surcharge/energy surcharge" on each invoice used to charge it. As discussed herein, the fee is not, in fact, a fuel surcharge at all in that it does not relate to NuCO2's increased fuel costs nor is it used by NuCO2 to offset those increased fuel costs, which are regardless recovered in the prices NuCO2 otherwise charges customers.

14.     Defendant NuCO2, LLC. is a Delaware entity with its principal place of business in Stuart, Florida.

### IV.     CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action pursuant to Rule 23(a) and (b)(3), and proposes the following classes:

> **The Rate Increase Class:** All persons or entities who reside in the United States who, from March 6, 2014 through the date of class certification, entered into a standard contract with NuCO2 and paid more than their contractually-agreed upon price as a result of NuCO2's automated price increases.

> **The Fuel Surcharge Class:** All persons or entities who reside in the United States who, from March 6, 2014 through the date of class certification, entered into a standard contract with NuCO2 and paid a "Fuel Surcharge"

(also referred to as a "Fuel Surcharge/Energy Surcharge" or "Energy Surcharge).

16.     Excluded from the proposed classes are members of the judiciary, entities currently in bankruptcy, entities whose obligations have been discharged in bankruptcy, and governmental entities.

17.     Plaintiff maintains the right to create additional subclasses or classes, if necessary, and to revise these definitions to maintain cohesive classes which do not require individual inquiry to determine liability.

**A.     Existence And Predominance Of Common Questions Of Law And Fact.**

18.     NuCO2 engaged in a common course of conduct which gives rise to common questions of law and fact which predominate in this litigation.  This common course of conduct— imposing unlawful price increases not allowed by contract and imposing fuel surcharges that were deceptive and unfair—effected class members in the exact same manner.  The amount of damages may differ among class members, but the fact and type of damages is uniform among all class members and flows directly from NuCO2's common conduct.  A single, uniform, pre-printed contract will govern all class members' contractual claims.  Florida law—mandated by NuCO2's own contract—applies to every member's claims.

19.     This shared nucleus of facts and law gives rise to numerous questions of law and fact which overwhelm any individual issues which might exist.  Such common questions include, but are not limited to, the following:

    a.     Whether NuCO2 used standard form contracts with customers;

    b.     Whether Florida law governs the claims of the classes;

    c.     Whether NuCO2 imposed price increases on putative class members who entered

into the standard contract;

d.      Whether NuCO2 imposed price increases on putative class members who's standard contract has renewed;

e.      Whether NuCO2's standard contract only allowed NuCO2 to increase prices after Price Adjustment Notifications or on the anniversary of the effective date of each contract (and then subject to specific amount constraints);

f.      Whether NuCO2 implemented the price increases through an automated customer relationship management system;

g.      Whether the price increases NuCO2 imposed were not authorized by its standard form contracts;

h.      Whether the price increases NuCO2 were enacted not in good faith;

i.      Whether NuCO2 engaged in deceptive or unfair conduct in representing and implementing the fixed prices and the price increases;

j.      Whether NuCO2's conduct in relation to raising prices constitutes a violation of the Florida Unfair and Deceptive Trade Practices Act.

k.      Whether NuCO2 charges customers who entered into the standard contract a fuel surcharge;

l.      Whether the fuel surcharge NuCO2 imposes is designed or intended to recover NuCO2's increased fuel or energy costs;

m.      Whether the fuel surcharge NuCO2 imposes is reasonably related to NuCO2's increased fuel or energy costs;

n.      Whether NuCO2 recovers the same costs which purportedly justify the fuel surcharge through the prices it charges and other fees;

o.      Whether NuCO2 uses revenue from the fuel surcharge to offset its increased fuel or energy costs;

p.      Whether NuCO2's use of the terms "fuel surcharge," "energy surcharge," and "fuel surcharge/energy surcharge" are deceptive.

q.      Whether NuCO2's practice of charging the fuel surcharge is unfair.

r.      Whether NuCO2's conduct in creating, implementing, and collecting the fuel surcharge constitutes a violation of the Florida Unfair and Deceptive Trade Practices Act.

**B.      Numerosity.**

20.      The total number of members of each putative class is so numerous that individual joinder is impracticable.  NuCO2 has over 170,000 customers, the majority of which incurred the fees and price increases at issue in this case.

**C.      Typicality.**

21.      The claims of the named Plaintiff are typical of the claims of the classes.  Plaintiff, like other class members, entered into the form contract, paid automated price increase that were not legally justified, paid deceptive and unfair fuel surcharges, and had the true nature of the price increases and fuel surcharges concealed from it.  Plaintiff was subject to, and harmed by, the exact same common policies and practices which effected all class members.

**D.      Adequacy.**

22.       Plaintiff will fairly and adequately protect the interests of the members of the class and has no interest antagonistic to those of other class members.  Plaintiff shares the same interests and was harmed by the same conduct as each other class member.  Resolution of this case will inherently vindicate and redress the interests of Plaintiff equally with class members.  Plaintiff has

retained class counsel competent and experienced in prosecuting class actions and such class counsel is financially able to represent the classes.

**E.    Superiority and Manageability.**

23.    The class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual joinder of all members of the class is impracticable. While the total amount at issue in this litigation is very large, individual damages for a given plaintiff are comparatively small and class members have little incentive to pursue individual claims.  The interests of judicial economy favor adjudicating the claims for the Plaintiff classes in a single forum rather than on an individual basis, thus also ensuring consistent adjudications and a uniformity of decision.  The proposed class definitions are objective and class membership is easily determined using customer information and financial records maintained by NuCO2 in electronic form. Calculation of damages can be accomplished using systematic means and objective criteria.  The class action mechanism is administratively feasible and provides the benefit of unitary adjudication, economies of scale and comprehensive supervision by a single court.

**V.    FACTUAL ALLEGATIONS**

24.    NuCO2 is one of the largest beverage carbonation companies in the United States, providing services to more than 170,000 customers across the country.  In 2013, NuCO2 was acquired by Praxair, Inc. for more than a billion dollars; Praxair is itself the largest industrial and medical gases company in North America, with more than $11 billion dollars in annual revenue and more than $2.4 billion dollars in annual profit. NuCO2 purports to be the only national seller of beverage grade carbon dioxide and beer grade nitrogen gas.

25.    Plaintiff is a small business that owns and operates a restaurant in Oviedo, Florida. Plaintiff sells carbonated beverages and beer, and to do so requires a certain grade of carbon

dioxide and nitrogen and related equipment (like bulk tanks or dispensing machines).   Like tens of thousands of other small businesses in the United States, Plaintiff contracted with NuCO2 pursuant to a form contract to obtain these products and equipment for a fixed price.

26.     And, like tens of thousands of other small businesses, after agreeing to provide products and equipment for fixed prices—and locking customers into a six-year contract—NuCO2 repeatedly increased these prices with no contractual justification.   NuCO2 did so through a consistent, centralized automated price increase process that was intended to glean millions of dollars of unearned profit from its customers.   This conduct constitutes a breach of contract and a violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statute § 501.201, *et seq.*

27.     NuCO2 additionally engaged in a related, but separate, deceptive and unfair course of conduct through the charging of fees it calls "fuel surcharges/energy surcharges." In truth, these fees, in intent and effect, are nothing more than profit enhancers for NuCO2; they bear absolutely no relation to any increased fuel or environmental costs NuCO2 might incur—which are regardless recovered in other charges—nor are they used to offset such costs.   Such conduct constitutes a violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statute § 501.201, *et seq.*

**A.     The Terms Of The Uniform Contracts.**

28.     NuCO2 uses effectively identical, form agreements to contract with customers. (*See* Contract, Ex. A).   Every class member entered into an effectively identical contract.   The form contract is a two-page agreement where all relevant terms are pre-printed by NuCO2.   The first page of the form agreement contains blanks where the customer name and contact information is entered and both parties may sign and date.   The first page of the form contract also contains a

10

table where the type of equipment and product being provided by NuCO2—along with fixed prices—are specified.

29.     Aside from establishing fixed prices for products and equipment, the form contract also contains certain standard provisions.

    a.  **Florida Choice of Law Provision**: Under "Jurisdiction," it provides that the agreement between the parties "shall be governed by and construed under the laws of the State of Florida."

    b.  **Long, Evergreen Term**:  Under "Term," it provides a default term of six years which automatically renews for additional six-year periods unless a customer cancels at least twelve months before expiration of the term.

    c.  **Punitive Default Provision:** Under "Default," it provides that if a customer does not pay on time, or otherwise is deemed in "default," NuCO2 will repossess all equipment and fore the customer to pay the balance of the monthly charges for the remainder of the six-year term, potentially tens-of-thousands of dollars.  This is in addition to NuCO2's "reasonable attorney's fees" and "any other rights or remedies…"

    d.  **Integration Clause:**  Under "Interpretation," it provides that the form agreement "covers all agreements and understandings between the parties relating to the subject matter herein" and that this agreement "may not be amended or altered except in writing signed by all parties."

30.     The form agreement also provides that NuCO2 can only increase the fixed prices in two specific circumstances, and only then subject to limits in amount.  First, on the "anniversary of the effective date" of the specific customer contract, NuCO2 may implement a "price

adjustment" that is no more than 5% or "the percentage change in a US Department of Labor price index selected by [NuCO2] to reflect [NuCO2's] increased costs. Second, NuCO2 may adjust the fixed prices if it does so "effective fifteen (15) days after notifying [customer] of such Price Adjustment (a "Price Adjustment Notification"). If this Price Adjustment Notification is provided, customer then has the contractual right to provide NuCO2 with a competitor's offer which entitles the customer to cancel the agreement unless NuCO2 matches or betters that offer.

31.     Finally, the form agreement also provides general language that customers will pay applicable taxes and fees, including any "energy surcharge for delivery of Product (per PURCHASER Location) in accordance with SELLER's then current energy surcharge)…."

**B.     NuCO2's Unlawful, Unilateral Price Increase Practice.**

32.     Despite the express limitations on the circumstances and amounts whereby NuCO2 could increase prices, NuCO2 carried out a systematic and deliberate practice of repeatedly increasing prices without contractual authorization.

33.     NuCO2 induces customers into entering into form contracts with fixed prices while knowing, but not disclosing, that it has an internal corporate practice and strategy of continually, invariably, and unlawfully increasing prices for the products and equipment it provides. This includes the bulk $CO_2$ tanks, the high-pressure gas beverage systems, and the $CO_2$ and other types of gas.

34.     These price increases are directed by NuCO2's corporate officers as part of a broad strategy to increase revenue and profit, but NuCO2 employees are allowed some limited ability to increase prices as much as possible while ensuring that customers are not alerted to the overarching intention. Upon information and belief and investigation, these rate increases are automated through NuCO2's customer relationship management system and take effect for class members at

the same time.

35.     These automated, systematic price increases are generally executed by NuCO2 in January of each year.  They vary in amounts, but range between 4% and 12%.  NuCO2's price increase practices have been in place since, at least, 2013 when it was acquired by Praxair.  For example, Plaintiff TownHouse Restaurant's bulk CO2 tank rental price was unilaterally increased by NuCO2 in January 2019 in an amount of $5.28 per month, or 7% of the then current charges. In January of 2018, NuCO2 similarly unilaterally increased Plaintiff's bulk CO2 tank rental price 5%.

36.     NuCO2 also implemented unilateral automated price increases on other products and equipment.  For example, in January 2019 it increased the price it charged Plaintiff for the Xactmix high pressure system $3.07, or 7% of the then current charges.  This is not an exhaustive list; NuCO2's unlawful automated price increases also reach the CO2 gas and other products and equipment its sells.

37.     Upon information and belief, based upon investigation, NuCO2 imposed price increases identical in timing, methodology, and intent (and similar if not identical in percentage) as it imposed on Plaintiff across most of its customer base each year.  Customers often are charged as much as 50% more than the fixed prices agreed by the end of the first term of the uniform contract. Indeed, as of January 2019, less than four years into the six-year contract, NuCO2 has unilaterally and unlawfully increased the price it charges Plaintiff for a bulk CO2 tank by 40%.

38.     Notably, these unilateral automated price increases are not allowable under the form contract that Plaintiff and each class member entered into.  The price increases are made in January of each year, not on the effective date of each contract (nor are they the amount of a specific inflationary index), thus they are the not "anniversary date" price increases contemplated

by the form contract.   Nor does NuCO2 provide customers with a Price Adjustment Notification prior to making these increases, or enact the increases 15 days after such a notification, with the ability for customers to obtain a competitor's bid and avoid the increase or void the contract.   Thus, the unilateral automated price increases are not the "price adjustment notification" increases contemplated by the form contract.   In fact, NuCO2 has a policy and practice of implementing these additional increases on top of the unilateral automated price increases at issue in this case.

39.     There is no legal justification for NuCO2's practice of unilateral, systematic price increases. The form contract, which NuCO2 drafted and presents as a contract of adhesion, does not allow for them.   NuCO2 does not provide notice of such increases and it knows when it presents contracts for fixed prices that these prices will rise precipitously and continually.   NuCO2's practices breach the form contract it entered into with Plaintiff and thousands of others small businesses across the country, violates the duty of good faith and fair dealing that underpins that contract, and constitutes a deceptive and unfair trade practices under Florida law.   As a direct result of its unlawful conduct, NuCO2 has wrongfully taken millions of dollars from its customers over a period of years.

**B.     NuCO2's Deceptive And Unfair Fuel Surcharge.**

40.     NuCO2 charges a fee it calls a fuel surcharge (or a "fuel surcharge/energy surcharge" or "energy surcharge") purportedly to recover the increased fuel and "energy" costs it incurs in delivering products to customers.[3]   NuCO2 charges this fee to the majority, at least, of its customers.   The fuel surcharge is a flat amount that is the same for each customer.   NuCO2 periodically increases, but does not decrease, the amount of the fuel surcharge.   For example, the

---

[3] NuCO2 does not have any discrete, trackable "energy" costs and it purports to base the fuel surcharge on a national diesel fuel index, so the allegations herein will therefore refer primarily to fuel costs.

fee was $14.55 in 2015 through 2018 before being raised to its current level of $16.05.  By using these terms—a term which NuCO2 has uniformly used on every invoice received by every Class Member charged this fee—NuCO2 represents that this fee is directly related to its increased fuel costs and that this fee will be used to defray such costs.

41.     In truth, the fuel surcharge is wholly unrelated to NuCO2's actual or increased fuel costs, and is not charged to defray those increased costs. NuCO2 does not apply the money received from the Energy Surcharge to offset its increased energy costs; rather, it is recognized as revenue and contributes directly to NuCO2's profit. It does not vary or fluctuate in accordance with NuCO2's actual increased fuel costs and the method by which NuCO2 determines the fuel surcharge has no relation to its increased fuel costs or to any changes in those costs.  Despite its representations that it uses "a prevailing national average price index for diesel fuel," NuCO2 has done no legitimate analysis to determine the proper amount of the fuel surcharge in connection to its actual increased or decreased fuel costs.

42.     Indeed, the fuel surcharge does not fluctuate in any way with the NuCO2's increased cost of diesel fuel and NuCO2's representation—made on every invoice charging the fee—that the fuel surcharge is not "based on the prevailing national average price index for diesel fuel" is false.  For example, the fuel surcharge was $14.55 for every customer for at least three years while the price of diesel fuel and NuCO2's diesel cost varied.  When NuCO2 increased the fuel surcharge most recently it did not do so in response to increased costs it incurred, nor in relation to any legitimate change in a governmental index, but rather to derive additional unearned profit from its customers.  For example, as of February 2019 NuCO2 assessed a fuel surcharge of $16.05 and the average retail price of diesel fuel was $3.00.  In contrast, in February 2018, NuCO2 assessed a fuel surcharge of $14.55 and the average retail price of diesel fuel was $3.05.  Diesel

prices decreased but NuCO2 increased its fuel surcharge. There is no internal process or justification for the fuel surcharge and the methodology—or lack thereof—by which NuCO2 charges it demonstrates that this fee is actually a hidden price increase that NuCO2 falsely represents to be a fuel surcharge reasonably related to the increased fuel costs it incurs in delivering products.

43.     Additionally, NuCO2 already fully recovers the increased fuel costs that purportedly justify the fuel surcharge through the rates it charges for products and delivery.  These rates include the individual component costs of NuCO2's business, including—specifically—the costs of fuel, energy, and other overhead.  NuCO2 even charges an "emergency delivery" charge of $185.00 for some deliveries as well.  When setting prices, NuCO2 takes into account its fuel and delivery costs to recover such costs and the fuel surcharge is a deceptively named hidden price increase.

44.     NuCO2 also has omitted material facts regarding the fuel surcharge.  For example, NuCO2 does not disclose that the fee is not related to NuCO2's increased or actual fuel costs, that that NuCO2's increased fuel costs are not a factor in the amount of the fuel surcharge, that the amount of the fuel surcharge is not tied to any legitimate government index, and that the fuel surcharge is recognized as profit.  NuCO2 does not disclose its actual fuel costs to customers nor does it disclose the methodology, to the extent there is one, used to determine the amount of the fuel surcharge.  In truth, NuCO2 devised, implemented, and set the amount of the fuel surcharge simply to increase their profits without any intent of recovering the increased energy costs they incur in servicing customers. NuCO2 knows when it enters into an agreement with a customer that the customer will pay substantially more than the agreed upon service rate through a fuel surcharge which is entirely unfair, deceptive and/or misleading.  NuCO2 does not disclose this fact to its

customers.

45.     NuCO2 has consistently and continually misrepresented the nature and purpose of the fuel surcharge.  It does so to mislead its customers into believing that this is a legitimate fee which is directly related to increased energy costs NuCO2 incurs in delivering products and that it is based on a prevailing national average price index for diesel fuel.  This practice was designed by NuCO2 to deceive its customers, and is likely to deceive those customers acting reasonably under the circumstances.  This practice is inherently unfair.  Through the deceptive and unfair fuel surcharge, NuCO2 has unlawfully garnered millions of dollars from customers it has not earned.

**B.     NuCO2's Efforts To Ensure No Customer Can Avoid Its Unlawful Practices.**

46.     NuCO2's price increase and fuel surcharge practices are egregious and unlawful. The standard form contract contains a long, six-year term.  This term auto-renews for additional six-year terms unless the customer provides notice to NuCO2 that it would like to cancel at least 12 months ahead of the end of the term.  This provision is designed to ensure that—after NuCO2 agrees to fixed price customers—customers are locked in, repeatedly, to long terms during which NuCO2 repeatedly increases prices and charges bogus fees.

47.     NuCO2 ensures that customers are not aware of the unlawful nature of these practices by withholding relevant information from customers, including information about the intent, purpose, and legality of the price increases and fuel surcharges.

48.     However, should a customer attempt to avoid the increased costs NuCO2 imposes, NuCO2 utilizes the stringent "default" provisions in the form contract to prevent that customer from doing so without incurring huge costs.  The form contract defines "default" as, in part, any "payment delinquency."   Thus, should a customer decline to pay the rate increases or fuel surcharges, NuCO2 can, and does, "repossess the equipment" without notice, and charge the

customer the entire amount that would have been owed under the rest of the term of the contract. This can be tens of thousands of dollars. NuCO2 also, then, can seek its "reasonable attorney's fees" in enforcing this wholly unreasonable and punitive provision. The "default" provision in the form contract is intended to give customers no option other than to pay NuCO2's unlawful price increases and fuel surcharges.

49.     Notably, this practice is not theoretical; customers regularly encounter these tactics from NuCO2. Even a small sampling of complaints submitted to the Better Business Bureau— which does not consider NuCO2 to be an accredited business—are telling.[4]   For example:

- A complaint made in December 2018 states: "NuCo2 is a company based on deceit…They raise their prices without any recourse or justification…After reading other complaints this company needs to be stopped form doing business that is false and misleading."

- A complaint made in November 2018 states: "They raise their prices without any recourse or justification….I've tried several times to reach an agreement and they just tell you bluntly they don't care about the issues they will not cancel your contract and if you don't pay they will send it to a collections agency and they will…[I've] just had all kind of issues, headaches and problems, I'll hav[e] a blemish on my credit that I've built in 33 years.

- A complaint made in April 2016 states: "NuCO2 has by far been the most evasive and frustrating company I have ever dealt with and after 15 years in business, I have never had to signa. 6 year contract, and gotten such poor service and inconsistent

---

[4] This selection of online complaints are taken from the Better Business Bureau website, available at   https://www.bbb.org/us/fl/stuart/profile/food-manufacturing-equipment/nuco2-parent-inc-0633-12001673/complaints.

monthly statements….I just received a threatening letter…that we have no right to terminate our agreement, and [are] liable for all cancellation fees and if we engage in business with another company we interfere with their contractual relationship…."

- A complaint made March 2018 states: "Crooks and Cheaters. Never [do] business with th[ese] people.  I have 5 years contract with them with starting fee around $75 which by the end of my term came to be around $150 per month…I was then sent an invoice for $5,563.98…claiming that my contract was never canceled and I have to pay [] them for 5 year term in full…Beware of this company."

- A complaint made December 2017 states: "Overcharged, never notified of price increases, dishonest business practices…" Another complaint made May 2017 states: "NuCo2 Control binds you in a contract and then keep[s] raising prices….This company is a fraud…."

## VI.     CHOICE OF LAW

50.     The uniform contract at issue in this litigation establishes that it "shall be governed by and construed under the laws of the State of Florida."  Under applicable law, this provision, and the facts of this case, mandate that Florida statutory and common law apply to Plaintiff and each class member's claims.

51.     The offending conduct at issue in this case took place predominantly or entirely in Florida.  NuCO2, throughout the time period at issue and when the fees and pricing practices at issue began, was headquartered in Stuart, Florida.  The deceptive and unfair conduct that gives rise to Plaintiff and putative class members' FDUTPA allegations and complaint emanated from NuCO2's headquarters in that the representation and omissions—including the naming of the fees,

the purported method of calculation that justified the fees, the invoices, website and statements regarding the fees, and the disclosures and omissions regarding price increases—were created and disseminated from its Florida headquarters.

## VII.   CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
#### (Price Increase Class)

52.     All allegations and paragraphs in this complaint are incorporated by reference.

53.     Plaintiff and each member of the class entered into form, written agreements with NuCO2.

54.     Plaintiff and each member of the class performed on their agreements.

55.     As set out herein, through its practice of unilaterally increasing rates not in accordance with any contractual provision, NuCO2 breached the agreements.

56.     Plaintiff and each member of the class have been directly and proximately harmed by NuCO2's breach of contract in that each paid more for products and/or equipment.

### COUNT II
### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
#### (Price Increase Class)

57.     All allegations and paragraphs in this complaint are incorporated by reference.

58.     To the extent necessary, this count is pled in the alternative.

59.     Plaintiff and each member of the class entered into form, written agreement with NuCO2.

60.     Plaintiff and each member of the class performed on their agreements.

61.     NuCO2 failed to perform on the agreements in good faith.  NuCO2 acted arbitrarily and capriciously. It failed to fulfill any discretionary duties it might have under the contract in

altering prices reasonably and in good faith.  NuCO2's uniform course of conduct in raising prices

lacks honesty in fact and is inconsistent with the justified expectation that NuCO2 would increase

rates reasonably. Through its wrongful conduct, NuCO2 unfairly prevented Plaintiff and each

member of the class from receiving the full benefits of their agreements.

62.     Plaintiffs and each member of the class have been directly and proximately harmed

by NuCO2'a breach of the covenant of good faith and fair dealing in that each paid an unlawfully

increased rate.

**COUNT III**
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR**
**TRADE PRACTICES ACT, FLORIDA STATUE § 501.201, *et seq.***
**(Price Increase Class)**

63.     All allegations and paragraphs in this complaint are incorporated by reference.

64.     Plaintiff and each member of the class are "consumers" under FDUTPA (Fla. Stat.

§ 501.203(7)).

65.     NuCO2 engaged in deceptive conduct with regard to its systematic, unlawful price

increases as set out above, including by representing rates as fixed while knowing that it would

engage in consistent and deliberate subsequent price increases, by falsely representing price

increases as contractually allowed, and by withholding material facts regarding its price increase

polices. NuCO2 was the party directly making such misrepresentations and omissions.  Such

conduct is likely to mislead customers acting reasonably, to such customers' detriment.

66.     NuCO2 engaged in unfair conduct with regard to its systematic, unlawful price

increases as set out above, including by charging excessive, unlawful price increases, by inducing

customers into long term contracts without disclosing the huge price increases NuCO2 intended to

assess, and by forcing customers to pay such unconscionable price increases.

67.     As a result of the deceptive and unfair practices described above, Plaintiffs and each

member of the putative class were directly damaged in that they paid the unlawful price increases.

## COUNT IV
### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLORIDA STATUE § 501.201, *et seq.*
#### (Fuel Surcharge Class)

68.    All allegations and paragraphs in this complaint are incorporated by reference.

69.    Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. ("FDUTPA"), prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

70.    The stated purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.202.

71.    Plaintiffs and each member of the putative class, as "consumers" under FDUTPA (Fla. Stat. § 501.203(7)), have been harmed by NuCO2's unconscionable, deceptive, and unfair acts and practices in the charging of the Energy Surcharge.  NuCO2 characterizes the fuel surcharge as a legitimate charge which is designed to recover the increased fuel costs it incurs in providing products and equipment to its customers, is related to a national average for the price of fuel, and which is used to offset the increased fuel costs it incurs. In truth, NuCO2's fuel surcharge does not bear any relation to any increased costs nor any actual costs incurred by NuCO2 and is not used to offset any actual or increased costs.  In fact, it is not a true fuel surcharge at all in that for this reason, but rather is a hidden price increase which NuCO2 misnames to hide its effect and purpose from customers.

72.    Further, NuCO2 already recovers any fuel costs, including increased fuel costs, it might incur through the rate NuCO2 charges for its products and services and other ancillary fees.

73.     Specifically, NuCO2's deceptive practices directed toward Plaintiff and putative class members include:

    a.   the naming of the fee as such given the true nature and effect of the fee;

    b.   the representation that the fuel surcharge is related to a legitimate index and fluctuates as the "prevailing" cost of fuel fluctuates;

    c.   the representation that the fuel surcharge acts and is intended to act as a true fuel surcharge; that is, that the fee is reasonably and directly related to NuCO's actual increase cost of fuel;

    d.   the failure to disclose that the fuel surcharge is not related to any fuel cost NuCO2 incurs;

    e.   the failure to disclose that the fuel surcharge is not used to offset any fuel costs NuCO2 incurs but rather is recognized as separate revenue which directly contributes to NuCO2's profit;

    f.   the failure to disclose that the fuel surcharge, in intent and effect, operates as a hidden price increase;

    g.   the failure to disclose that NuCO2 already recovers for the costs which purportedly justify the fuel surcharge through the prices and other ancillary fees it charges;

    h.   the failure to disclose that periodic increases in the amount of the fuel surcharge are driven, not by any legitimate analysis or cost NuCO2 incurs, but by efforts to increase profit margins;

74.     NuCO2 makes these misrepresentations and omissions every time it sends an invoice to each class member charging the fuel surcharge, falsely naming it as such, and falsely describing it.

75.     NuCO2's misrepresentations, omissions, and deceptive practices as set out herein are likely to mislead reasonable consumers under the circumstances.

76.     NuCO2's actions or inactions directed toward Plaintiff and putative class members are also unfair.  Such actions or inactions include:

      a.    imposing fees it terms "fuel surcharges" which, in fact, are hidden price increases wholly unrelated to any increased fuel cost NuCO2 may incur;

      b.    charging fuel surcharges which do not offset any increased fuel cost but rather directly contribute to NuCO2's bottom line;

      c.    charging a fuel surcharge purportedly for costs which NuCO2 already recovers through prices for products and equipment and other ancillary fees;

      d.    increasing the fuel surcharge without regard for or analysis of any actual increased fuel costs incurred; and

      e.    charging a fuel surcharge when NuCO2's actual fuel costs decrease.

77.     NuCO2's unfair practices as set out herein are likely to mislead reasonable customers under the circumstances.

78.     As a result of the deceptive and unfair practices described above, Plaintiff and each member of the putative class were damaged in that they paid the improper fuel surcharges to their detriment, and seek to recover the entirety of the amounts paid.

## VIII.   PRAYER FOR RELIEF

79.     Plaintiff, on behalf of itself and each member of the putative classes, demands all remedies and damages available to it, including all unlawful price increases paid to NuCO2, all fuel surcharges paid to NuCO2, injunctive relief, restitution, interest, and the attorneys' fees and costs incurred in bringing this action.

## TRIAL BY JURY

Pursuant to the seventh amendment to the Constitution of the United States of America,

Plaintiff and The Class are entitled to, and demand, a trial by jury.

Dated: March 6, 2019                    Respectfully submitted,

                                              _____

Anthony J. Garcia
**AG LAW, P.A.**
742 S. Village Circle
Tampa, Florida 33606
Phone: 813.259.9555
Fax: 813.254.9555
anthony@aglawinc.com

Nicholas W. Armstrong
Garrett Owens
**PRICE ARMSTRONG, LLC**
2421 2nd Avenue North, Suite 1
Birmingham, AL 35203
Phone: 205.208.9588
Fax: 205.208.9598
nick@pricearmstrong.com
garrett@pricearmstrong.com
*Pending Admission Pro Hac Vice*

Taylor C. Bartlett
**HENINGER GARRISON DAVIS, LLC**
2224 First Avenue North
Birmingham, Alabama 35203
Phone: 205.326.3336
taylor@hgdlawfirm.com
*Pending Admission Pro Hac Vice*

*Attorneys for Plaintiffs*