# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 2:19-CV-14085-ROSENBERG/MAYNARD

TOWNHOUSE RESTAURANT OF
OVIEDO, INC. & ESTERO BAY
HOTEL CO.,

    Plaintiffs,

v.

NUCO2, LLC,

    Defendant.

_____/

## ORDER DENYING PLAINTIFFS'
## RENEWED MOTION FOR CLASS CERTIFICATION

    This cause is before the Court on Plaintiffs' Renewed[1] Motion for Class Certification [DE 107]. The Court has considered the Renewed Motion, Defendant's Response, Plaintiffs' Reply, and is fully advised in the premises. For the reasons that follow, the Renewed Motion is denied.

    This is a case about periodic price adjustments. Plaintiffs and Defendant were parties to a contract. In that contract, the parties agreed (subject to certain restrictions and conditions) that Defendant could periodically adjust and charge certain costs to Plaintiffs. Plaintiffs contend, however, that the methodology Defendant used to calculate the charges was deceptive and, in the Renewed Motion before the Court, Plaintiffs seek to certify a nationwide class for every customer of Defendant that was affected by the charges.

## BACKGROUND

### I.    The Parties

    The Defendant in this case, NuCO2 LLC ("NuCO2"), provides $CO_2$, equipment, and related services for beverage carbonation throughout the continental United States. (Ex. F, 20:1-10, 21:2-21). Its customers operate businesses like restaurants, bars, breweries, gas stations, country clubs,

---

[1] The Court previously denied without prejudice Plaintiff's Motion for Class Certification to permit the parties to conduct additional discovery. DE 76.

hospitals, and universities.  (Ex. 1, ¶10; Ex. 2, ¶11, Ex. 3, ¶10; Ex. 4, ¶6; Ex. 5, ¶11).  NuCO2 currently services roughly 176,000 customer locations in 47 states.  (Ex. F, 21:2-21).  Nationwide, NuCO2 employs 60 Territory Sales Managers ("TSMs"), who sign up customers within their respective territories.  (*Id.*, 14:13-15:8).

A named Plaintiff in this case, Estero Bay Hotel Co. ("Estero Bay"), is a former NuCO2 customer that operates a hotel and restaurant in Fort Myers, Florida.  (Ex. R, 6:20-4).  Estero Bay has 50 to 75 employees.  (*Id.*, 7:9-12, 8:4-11, 96:18-21).  Estero Bay used NuCO2's services until September 2015.  The other named Plaintiff in this case, Townhouse Restaurant of Oviedo, Inc. ("Townhouse"), remains a NuCO2 customer and operates a restaurant in Oviedo, Florida. (Ex. S, 6:13-16, 8:13-16).  Townhouse has 54 employees.  (*Id.*, 9:2-8).

## II.     The Claims

Plaintiffs have brought claims for breach of contract and for violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  Plaintiffs' claims are all premised upon Defendant's practice of calculating certain charges.  Plaintiffs have not moved to certify a class on their breach of contract claims and have instead only sought certification for their FDUTPA claims.  Plaintiffs' FDUTPA claims, however, are premised upon the parties' contractual agreements and, as a result, the Court details below the contractual provisions at issue in this case.

## III.    The Contractual Terms

Plaintiffs dispute three general types of provisions in their agreements—an "open escalation" price adjustment, a fuel surcharge, and an energy surcharge.[2]  Estero Bay relies upon an unsigned Bulk $CO_2$ Budget Plan Agreement under which it agreed to lease equipment and purchase $CO_2$ over a six-year term.  (DE 18-2 at 2).  In its deposition, however, Estero Bay was unable to identify which contract it believes was in effect when it terminated its relationship with NuCO2 in September 2015.  (Ex. R, 178:19-179:6).  Estero Bay did not furnish any signed agreement as an exhibit to its renewed motion for class certification.  Townhouse relies upon a Beverage Gas Equipment/Product Supply Agreement dated April 6, 2015, under which it agreed to lease equipment and purchase $CO_2$ over a six-year term.  (DE 18-1 at 2).

---

[2] Plaintiffs did not raise any arguments related to the annual price adjustment in their renewed motion for class certification (although pleaded in their Amended Complaint).

A.    The Open Escalation Provisions

The agreements attached to the Amended Complaint contain a type of "open escalation" provision that allows NuCO2 to raise prices, subject to proper notice and the ability of Plaintiffs to obtain a better offer from a competitor.  Among other factors, rising raw material and regulatory costs factor into the decision to implement an open escalation price increase.  (Ex. 6, ¶¶4-5).

While the provisions in Plaintiffs' agreements are not identical, (DE 18-1 at 2; DE 18-2 at 2), both indicate that if the customer locates a better offer, NuCO2 may match that offer or reinstate its prior rates.  If NuCO2 declines to do either, Plaintiffs may terminate the agreement with respect to any affected locations.  Thus, customers of NuCO2 are not strictly bound to pay any "open escalation" price increase.

B.    Fuel and Energy Surcharges

Townhouse's contract and Estero Bay's unsigned contract contain provisions related to "energy surcharges."   While both refer to "energy surcharges," Plaintiffs call Estero Bay's surcharge a "fuel surcharge" for reasons that are not clear.  The pertinent language is not the same in these contracts. Estero Bay's 2009 contract cited in the Amended Complaint provides, in relevant part:

> LESSEE shall pay LESSOR any applicable delivery charge, surcharges, including an energy surcharge for delivery of liquid $CO_2$ (per LESSEE location) in accordance with LESSOR's then current energy surcharge, and other charges or surcharges applicable to LESSOR's customers generally in effect from time to time, including any increases in such charges and surcharges at any time.

(DE 18-2 at 2).  In Exhibit Q, Estero Bay cites a different, executed contract from 2006 that references a monthly fuel surcharge.

Townhouse's agreement provides, in relevant part:

> PURCHASER shall pay SELLER any applicable delivery charges, regulatory administrative fees, surcharges (including an energy surcharge for delivery of Product (per PURCHASER Location) in accordance with SELLER's then current energy surcharge), and other charges or surcharges applicable to SELLER's customers generally in effect from time to time.

(DE 18-1 at 1).

While neither provision indicates it, Plaintiffs contend that NuCO2 "deliberately conveys a particular meaning: that the fee is a legitimate pass-through charge related to its fuel or energy costs."  (DE 107 at 7).  Rather than a pure pass-through, NuCO2 targets a 45 to 50% profit for the

energy surcharge over its direct and indirect fuel costs.  (Ex. H, 22:13-25).  These costs include delivery and install, fuel surcharges billed to NuCO2, and fuel surcharges for freight (*e.g.*, a NuCO2 truck traveling from one state to another). (*Id.*, 26:18-28:13).  NuCO2's weighted average fuel rate, based on its fuel invoices, is compared against a diesel fuel index.  (*Id.*, 29:17-11).  One TSM at NuCO2 testified that when customers ask about the energy surcharge, he explains "that we are a for-profit company … and that we do charge and make a profit on our fees."  (Ex. W, 36:3-23).

## IV.   NuCO2's Negotiations with Tens of Thousands of Customers

Many of NuCO2's customers are sophisticated business entities that have substantial experience in negotiating supply agreements and who develop relationships with NuCO2's TSMs before negotiating and executing an agreement.  (Ex. F, 28:8-29:13, 128:22-129:19).  While Plaintiffs assert there is a "standard" contract, in reality NuCO2 has various templates, which the TSM and the customer use to negotiate the various terms of a possible agreement.  (*Id.*, 30:5-13).  Because many of NuCO2's customers are sophisticated, the customers and sometimes even their lawyers negotiate new terms and language to replace the template's language.  (*Id.*, 125:4-126:1).  As one TSM explains, "each customer is unique and . . . every interaction is different."  (Ex. X, 23:20-24:3).

NuCO2 has an "Approval Package" that provides a price list and "selling rules," by which TSMs may negotiate certain commercial terms without seeking approval within NuCO2.  (Ex. F, 62:16-21, 63:3-24).   Under these rules, TSMs can and do request and receive approval for discounts on the energy surcharge.  (*Id.*, 67:23-68:7).  Thus, in addition to customers who are charged the "standard" or most common rate, there are customers who receive a lower energy or fuel surcharge after negotiations.  (Ex. E, 23:7-11).  The same rules apply to the open escalation provision, although NuCO2 is more reluctant to change that term because of the volatility of $CO_2$ as a commodity; simply put, there is a system of give-and-take because parties adjust other commercial elements of the agreement as compensation.  (Ex. F, 168:3-10; Ex. 7, ¶¶6-13).

The results of the parties' negotiations are reflected in the final terms of the many tens of thousands of individual customer agreements that contain changes from the template.  (Ex. F, 30:10-25, 69:6-10).  While some customers may have few or no changes, for others, the terms of these agreements may be highly customized.  (*Id.*, 36:13-16).  Thus, Plaintiffs' references to

NuCO2's "standard" agreements actually refer to all agreements NuCO2 and its customers negotiated after <u>beginning</u> with one of ten templates.[3]  Plaintiffs also focus solely on contracts derived from six of these templates: "B," "D," "F," "G," "H," and "I."  (DE 107 at 1).  Final agreements, which result from individualized negotiations, are not identical across the proposed classes.

## V.      Personal Experiences of TSMs

To demonstrate the varying experiences of the thousands of NuCO2's customers who would be members of Plaintiffs' proposed classes, NuCO2 provided declarations from TSMs responsible for parts of Arkansas, Connecticut, Florida, Louisiana, New York, North Carolina, and Rhode Island.  These declarations highlight the following key points:

- A personal visit ranges from 20 to 30 minutes to over an hour;

- TSMs may have in-person discussions with customers regarding the energy surcharge and open escalation price increase provisions;

- TSMs have different approaches to explaining the meaning and reason behind the energy surcharge, but do not describe it as a "pass-through" cost;

- Some customers are familiar with energy surcharges from other sellers of $CO_2$;

- TSMs have different approaches to explaining the meaning and reason behind the open escalation price increase;

- TSMs may negotiate with the customer whether to keep both types of provisions in the final agreement, and may ultimately concede a discount on the energy surcharges or adjust other commercial terms in the final agreement; and

- Some customers are more likely to negotiate more heavily over these issues than others.

(Ex. 1, ¶¶11-25; Ex. 2, ¶¶12-26; Ex. 3, ¶¶11-30; Ex. 4, ¶¶7-23; Ex. 5, ¶¶12-28; *see also* Ex. 7).

## VI.     Plaintiffs' Negotiations and Interactions with NuCO2

Townhouse entered into its agreement with NuCO2 in 2014.  (Ex. S, 52:19-23).  At the

---

[3] The "standard" terminology comes from NuCO2's internal record keeping systems, which use a short-hand of "STA" or "ST" to distinguish agreements based on these templates from other types of agreements, such as legacy agreements from companies acquired by NuCO2. (Ex. E, 52:3-53:11; Ex. F, 34:4-36:16).

deposition, Townhouse's owner was unable to recall anything about its arrangements with its prior $CO_2$ vendor.  She did not recall whether they had a written agreement or whether the agreement had annual price increases, open escalations, price adjustments, or fuel or energy surcharges.  (*Id.*, 60:11-21).  She was unable to recall anything about the circumstances regarding her negotiation and execution of the NuCO2 agreement with Townhouse.

Specifically, Townhouse's owner did not recall: (a) how Townhouse found NuCO2 as a vendor; (b) looking into other $CO_2$ vendors; (c) if she had conversations with NuCO2 by telephone or face to face before signing the agreement; (d) anyone from NuCO2 coming to inspect her business; (e) being presented with the contract; or (f) asking anyone at NuCO2 about the contract before signing.  (*Id.*, 54:22-24, 55:5-7, 55:15-24, 60:25-61:3).

Townhouse's owner asserted that she assumed NuCO2 would not negotiate the terms of their agreement but cannot recall whether she even tried to negotiate. (*Id.*, 63:9-65:25).  She could not recall whether she attempted to negotiate any limitations for any of the provisions.  (*Id.*, 82:12-14). She also does not recall any discussions with anyone at NuCO2 about the open escalation provision (*Id.*, 80:1-4), or the energy surcharge (*Id.*, 80:9-13). After signing, she did not recall "ever thinking about" NuCO2's ability to increase prices, or that she could get a competitive offer. (*Id.*, 67:12-16, 74:17-5, 81:8-13). She contends that she did not understand that Townhouse could go out and get a competitive bid.  (*Id.*, 75:6-9, 81:20-24).

Beginning in late 2017, the reverse side of Townhouse's invoices contained a chart of terms, including "Fuel Surcharge/Energy Surcharge," (*e.g.*, Ex. G), which is defined as "[a] fee based on the prevailing national average price index for diesel fuel."  (*Id.*, p. 2) (emphasis added). Townhouse's owner admitted that she did not ever notice the chart of definitions on the backside of her invoices.  (Ex. S, 161:18-162:20, 163:9-18).

Estero Bay's general manager has held that role for over 30 years.  (Ex. R, 18:8-10). Estero Bay's relationship with NuCO2 began over 20 years ago.  (*Id.*, 98:5-7). He did not recall whether Estero Bay's original agreement with NuCO2 contained an open escalation provision or a fuel surcharge.  (*Id.*, 98:15-21).  In February 2006, Estero Bay executed an agreement containing an open escalation provision.  At that time, he fully understood that if, in fact, there was a price increase, Estero Bay could go out and get a competitive bid that NuCO2 could match or, alternatively, return to the prior rate.  (*Id.*, 126:19-23).  He also understood that if NuCO2 was not willing to do that, Estero Bay could terminate the agreement.  (*Id.*, 127:10-128:1).

Estero Bay's general manager was unable to identify whether, at the time of notifying NuCO2 of termination, he believed Estero Bay was terminating a March 2005 agreement, a February 2006 agreement, or the unsigned 2009 agreement.  (*Id.*, 178:19-179:6).

In discovery, Estero Bay only produced the front sides of its invoices.  Its general manager conceded that he did not recall ever looking at the "Table of Definitions," which appeared on invoices between 2010 and 2015.  (Ex. R, 150:17-151:6, 167:12-15).  Estero Bay received notices of annual price increases in January 2012, 2013 and 2014.  (*Id.*, 162:17-163:5, 165:11-17, 167:2-11).  These were not open escalations, but rather annual price increases, which are not at issue in this motion.  In 2015, Estero Bay received another notice, but the rate stayed the same throughout 2015.  (*Id.*, 168:24-19).  Since September 2015, Airgas, not NuCO2, has supplied Estero Bay with $CO_2$.  (*Id.*, 21:5-7, 176:19-177:8).  After the agreement was produced during the deposition, Estero Bay admitted that it had negotiated away fuel surcharges and hazardous fees in its current Airgas contract.  (*Id.*, 82:13-21).

## LEGAL STANDARD

Unless the named plaintiffs have standing and the putative class meets each of the requirements specified in Rule 23(a) and at least one of the requirements of Rule 23(b), class certification is improper.  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009). The Court must conduct a "rigorous analysis" of these requirements.  *Id.* at 1266.

Plaintiffs have the burden of proof. *Id.* at 1265. Class certification is an "evidentiary question, not just an analysis of the pleadings." *Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 790 (11th Cir. 2014); *see also Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016) ("Rule 23 imposes "a burden of proof, not a burden of pleading."). Plaintiffs must affirmatively demonstrate the requirements of Rule 23 are, in fact, satisfied. *Brown*, 817 F.3d at 1234.  Unlike at the motion to dismiss stage, the Court does not accept Plaintiffs' allegations as true, and does not draw all inferences and consider all evidence in the light most favorable to Plaintiffs. *Id.* at 1233.  Although the Court should not determine the merits of Plaintiffs' claim at the certification stage, the Court can, and should, consider the merits to the degree necessary to determine whether Rule 23 will be satisfied.  *Vega*, 564 F.3d at 1266. "All else being equal, the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation."  *Brown*, 817 F.3d at 1233.  If the

Court doubts whether the standard is satisfied, the party with the burden of proof loses. *Id.*

## ANALYSIS

Plaintiffs propose certification of the following classes:

All individuals and entities in the United States who paid the standard fuel surcharge to NuCO2 at any time from March 5, 2015 through the date of certification.

All individuals and entities in the United States who paid the standard energy surcharge to NuCO2 at any time from March 5, 2015 through the date of certification.

All individuals and entities in the United States who paid more than their contractually agreed-upon price as a result of an open escalation price increase from March 5, 2015 through the date of certification.

(DE 107 at 9). NuCO2 argues that Plaintiffs' proposed classes cannot be certified for a large number of reasons, however, NuCO2's arguments may be divided into two broad categories. NuCO2 argues that Plaintiffs' proposed class cannot be certified because the non-Florida class members must bring their claims under other states' laws—not FDUTPA—and because Plaintiffs have not met the requirements of Rule 23(a) and Rule 23(b)(3).[4] Each argument is addressed in turn.

## I.    Conflict of Laws

NuCO2 argues that conflict-of-laws principles preclude certification because all or most of the non-Florida putative class members cannot pursue claims under FDUTPA. Specifically, NuCO2 contends that Plaintiffs seek to certify a proposed nationwide class of NuCO2's customers in 47 states by asserting that FDUTPA applies to every single class member's allegations, regardless of location. (DE 107 at 3-5). Such an assertion necessarily requires an analysis of standing and conflict of law principles. When NuCO2 raised these issues previously in its response to Plaintiffs' initial motion for class certification, the Court instructed the parties that, for purpose of determining whether the FDUTPA can apply to the claims of members of the proposed class, the Court will follow *Bank of America, N.A. v. Zaskey*, No. 15-CV-81325, 2016 WL 2897410, at

---

[4] The prong under Rule 23(b) that Plaintiffs have elected to pursue in this case is 23(b)(3).

*9 (S.D. Fla. May 18, 2016) (Rosenberg, J.), which holds that out-of-state plaintiffs have standing to sue under FDUTPA when the "offending conduct" occurred "entirely" or "predominantly" in Florida.

"Although there is no categorical bar to class treatment where the law of multiple states will apply, courts have expressed some skepticism of such treatment, particularly in substantive areas where the content of state law tends to differ." *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1180 (11th Cir. 2010). In such a case, the plaintiffs "face an uphill battle in obtaining certification of a nationwide class." *In re Photochromic Lens Antitrust Litig.*, No. 10-CV-1158, 2011 WL 13141933, at *3 (M.D. Fla. Oct. 26, 2011).

A.   Plaintiffs Failure to Show the Absence of Conflicts between FDUTPA and Other States' Laws.

"It is not the Court's obligation to survey the laws of 46 [here, 47] states." *Gelfound v. Metlife Ins. Co. of Conn.*, 313 F.R.D. 674, 677 (S.D. Fla. 2016). "Undeniably, it falls to the plaintiff to demonstrate the homogeneity of different states' laws . . . ." *Sacred Heart*, 601 F.3d at 1180. "This is no easy task." *Gelfound*, 313 F.R.D. at 677. The party seeking certification must provide an "extensive" analysis of state law variations to reveal whether they pose insuperable obstacles. *Sacred Heart*, 601 F.3d at 1180. The Court determines whether Plaintiffs have satisfied that burden. *Id.*

NuCO2 argues that Plaintiffs also fail to establish the absence of material conflicts between FDUTPA and the laws of other states, and have conducted no analysis of the variations in state law. In their Reply, Plaintiffs assert that Florida, not any other state, has the greater interest and NuCO2 has not identified a state that has a more significant interest than Florida. But where one seeks to certify a FDUTPA-only class, it is Plaintiffs' burden to demonstrate that FDUTPA applies to every member of the putative nationwide class by conducting analysis on this issue. Indeed, as other courts have recognized, the differences among states' unfair and deceptive trade practices laws are numerous: "(1) some states have no private cause of action under their consumer protection laws or limit the right to a private action; (2) other states prohibit or restrict class actions; (3) some states require willful conduct while others do not require intent; (4) some states require a showing of reliance on the alleged deception and (5) in some states the action is limited to natural persons, while others allow businesses to sue." *Cohen v. Implant Innovations, Inc.*, 259 F.R.D.

617, 634 (S.D. Fla. 2008).  As a result, this Court has repeatedly held that the variations in the unfair and deceptive trade practice laws across the nation can pose an insurmountable hurdle to nationwide class certification.  *See Karhu v. Vital Pharms.*, No. 13-CV-60768, 2014 WL 815253, at *11 (S.D. Fla. Mar. 3, 2014); *Morris v. ADT Security Servs., Inc.*, No. 07-CV-81074, 2009 WL 10691165, at *8-9 (S.D. Fla. Sept. 11, 2009); *Cohen*, 259 F.R.D. at 634; *Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221, 229 (S.D. Fla. 2002); *see also Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1236-37 (11th Cir. 2016).  At a minimum, Plaintiffs could have addressed the six states that the TSM declarants cover.  They did not, despite the Court ordering Plaintiff "to more adequately address the issue of choice-of-law" on March 13, 2020.  (DE 76 at 2).  Plaintiffs' failure to show the absence of conflicts among other states' laws is fatal to certifying a nationwide class.

      **B.**    <u>For Non-Florida Members of the Proposed Classes, Florida Choice-of-Law Principles Favor the Application of the Law of their Home States.</u>

In terms of governing law, Plaintiffs' renewed motion focuses almost entirely on the threshold issue of whether FDUTPA <u>can</u> apply to absent class members' claims instead of the decisive question of what state's consumer protection laws <u>will</u> apply to those claims.  (DE 107 at 14-18).  Plaintiffs rely largely on cases resolved at the motion to dismiss stage to establish that FDUTPA <u>can</u> apply to absent class members' claims.  But although courts frequently grant plaintiffs the benefit of the doubt about the application of FDUTPA to survive a motion to dismiss, those generous inferences no longer hold true for class certification.  *E.g., Morris*, 2009 WL 10691165, at *6-9; *Montgomery*, 209 F.R.D. at 221.  To certify a FDUTPA-only class, it is Plaintiffs' burden to demonstrate that FDUTPA applies to every member of the putative nationwide class, and this Court must conduct a "rigorous" analysis of Plaintiffs' arguments and supporting evidence.  *Id.*  As set forth below, however, under Florida's choice-of-law principles, the deceptive trade practices laws of the other 46 states apply to these non-Florida citizens' claims.

In this diversity case, Florida's choice-of-law rules apply.  *Morris*, 2009 WL 10691165, at *6.  "Under Florida law, the appropriate analysis to apply to a deceptive trade practice statutory claim is the 'significant relationships' test of § 145 of the Restatement (Second) of Conflicts of Laws."  *In re NationsRent Rental Fee Litig.*, No. 06-CV-60924, 2009 WL 636188, at *5 (S.D. Fla. Feb. 24, 2009).  Under § 145, courts consider (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of

incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered.  *Id.*  Florida recognizes that "[t]he state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law."  *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980).

This Court has also considered §§ 6 and 148 for FDUTPA claims asserted alongside common-law claims.  *See Chiron Recovery Ctr., LLC v. AmeriHealth HMO of New Jersey, Inc.*, No. 16-CV-82043, 2017 WL 4390169, at *7-8 (S.D. Fla. Oct. 3, 2017 ) (Rosenberg, J.).  Under §§ 6 and 148, courts continue to apply "the presumption that the law of the place of injury applies," and § 6 recognizes that the plaintiff's home state has a "great interest" in the application of its own laws, which were passed to protect its own citizens.  *Id.* at *8.

All these considerations weigh in favor of applying the law of the state where a putative class member is located.  Plaintiffs challenge certain terms of their contracts, which are typically presented by TSMs to customers at their places of business in their home states and negotiated there. (Ex. 1, ¶¶3, 5, 11-18, 21; Ex. 2, ¶¶3, 5, 11-24; Ex. 3, ¶¶3, 5, 11-29).  These conversations are the initial communications between NuCO2 and its customers and, as such, provide context for any invoices or price increase letters customers subsequently received.  Plaintiffs dispute charges associated with NuCO2's services to those businesses at those locations, and open escalation price increases for products used in those places of business.  Plaintiffs also dispute the language of invoices and letters received at those locations. The parties' relationships are "centered" in the absent class members' home state, where NuCO2's non-Florida-based sales representatives develop individual relationships with them.  Finally, any alleged injuries incurred by putative class members would have occurred in those states.  *See Hutson v. Rexall Sundown, Inc.*, 837 So. 2d 1090, 1094 (Fla. Dist. Ct. App. 2003) ("[t]he alleged wrong was committed, and the damage done, at the site of the sale of appellees' products; that is, in the various states where members of the purported class made their purchases").

Plaintiffs argue that because NuCO2 generated letters at its principal place of business in Florida, FDUTPA applies to every single plaintiff nationwide.  (DE 107 at 16-18).  But this distorts the "offending conduct" standard and does not resolve the conflict-of-laws analysis, which actually weighs in favor of a different result because of the various additional factors that the Court must consider under the *Restatement* factors.  *See, e.g.*, *Karhu*, 2014 WL 815253, at *10 (finding that "the state with the most significant relationship to each class member's claim is the state where

the individual purchased [the product]," although "[t]he harmful conduct—the allegedly false advertising—occurred both in Florida, where VPX has its principal place of business and presumably generated its advertisements"). *Karhu* is a prime example of a named plaintiff who survived a motion to dismiss (as cited by Plaintiffs), but who was unable to establish that FDUTPA would apply to the entire class, resulting in a denial of class certification. Florida courts deny class certification in such a context because each plaintiffs' home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations. *Id.* Plaintiffs' few cases addressing choice-of-law principles are unpersuasive because they stand only for the principle that allegedly deceptive representations "made on a centralized website" results in greater weight being placed on a defendant's location because of the lack of a personal, non-internet relationship between the parties. *See Costa v. Kerzner Int'l Resorts, Inc.*, No. 11-CV-60663, 2011 WL 2519244, at *4 (S.D. Fla. June 23, 2011). Here, the parties do not have a "click"-based relationship.

In their Reply, Plaintiffs dismiss the discussions and negotiations between TSMs and their customers as irrelevant. Plaintiffs argue that a declaration by NuCO2's Vice President of Sales and Service establishes that "all relevant conduct" occurred in Florida. (DE 113 at 3). Plaintiffs' characterization of this declaration is misplaced. Although the declaration states that "the adoption of fees and price increases, the naming of fees, the invoice language regarding the fees, the creation and implementation of the price increases, and the letters regarding the price increases" occurred in Florida, it does not state that such activities constitute all relevant conduct. Indeed, Plaintiff disregards key relevant conduct which did not occur in Florida—the various discussions and negotiations of surcharges and price increases that were held across the country between individual non-Florida customers and individual non-Florida TSMs, of which there are tens of thousands. What was said by NuCO2's non-Florida employees to its non-Florida customers at their non-Florida business locations is highly relevant to the question of whether the "offending conduct" occurred "predominantly" in Florida.

Indeed, non-Florida based discussions and negotiations not only predate any invoice or letter NuCO2 sent after a deal on services was reached, they provide the backdrop for further communications between the customer and its TSM, which occur after a customer is billed the surcharge or after they received a price increase letter.

In their Reply, Plaintiffs rely on *Univ. Phys. Servs., LLC v. Del Zotto*, No. 16-CV-1274,

2019 WL 6033062, at *6 (M.D. Fla. Nov. 14, 2019), which is distinguishable because in that case, the communication at issue was made by the defendant Florida corporation's employee, who, unlike the TSMs here, worked in Florida. Therefore, in that case there was only one place where communication (i.e., the conduct at issue) occurred—in Florida. Not so here, where there is evidence of communications with TSMs occurring in six other states: Arkansas, Connecticut, Louisiana, New York, North Carolina, and Rhode Island.[5]

For putative class members with no Florida footprint, no one who negotiated and purchased NuCO2's products and services outside of Florida "could have reasonably expected Florida law to apply to those out-of-state transactions simply because [NuCO2] is headquartered in Florida." *See Morris*, 2009 WL 10691165, at *8. Thus, conflict-of-laws considerations weigh in favor the other 46 states' laws instead of FDUTPA for non-Florida members of the putative class. *See NationsRent*, 2009 WL 636188, at *5 (conduct and injury "occurred where the Agreements were entered into by the customers" and "the state in which the relationship was 'centered' is <u>the state in which the Agreements were executed by the respective Plaintiffs</u>.") (emphasis added); *Cohen*, 259 F.R.D. at 626-27 (deceptive trade practices claim governed by Missouri, not Florida, law when plaintiff was a Missouri corporation that purchased, received, and used product in Missouri); *Hutson*, 837 So. 2d at 1094 (holding that "the claims of non-resident consumers" regarding misleading label and point of purchase marketing techniques "would require the application of consumer protection laws from each of the states where the deceptive trade practice occurred and the non-resident claimants suffered injury").

Plaintiffs have not carried their Rule 23 evidentiary burden of demonstrating that, under Florida's choice-of-law rules, FDUTPA applies to claims of non-Florida putative class members.[6]

## II.    Rule 23(a)

Class certification under Rule 23(a) requires the Court to consider the following

---

[5] In addition to communications with customers in their home states, there is evidence that some of these TSMs hold on-site visits with non-Florida customers outside their home states. *See e.g.*, Ex. 2 (Arkansas-based TSM whose territory also includes part of Louisiana); Ex. 3 (Connecticut-based TSM whose territory also includes Rhode Island and part of New York).

[6] The Court's ruling is consistent with its rulings in prior cases such as *Bank of America, N.A. v. Zaskey*, 2016 WL 2897410, at *9 (S.D. Fla. May 18, 2016), because the alleged "offending conduct" in the instant case did not occur "entirely" in the state of Florida—it occurred in many states.

characteristics of a proposed class: (A) numerosity, (B) commonality, (C) typicality, and (D) adequacy.  Each is addressed in turn.

A.    Numerosity

Plaintiffs allege they have identified more than 5,000 members of each putative class and therefore numerosity is met.  Because NuCO2 does not dispute that, as currently defined, the proposed classes satisfy numerosity, the Court finds that numerosity is established.

B.    Commonality

Under Rule 23(a)(2), Plaintiffs must demonstrate that "there are questions of law or fact common to the class." That language is easy to misread, since any competently crafted class complaint literally raises common "questions." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011).  Rather, commonality requires the plaintiff to demonstrate that the class members have suffered the same injury.  *Id.* at 349-50.  Rather than examine the "raising of common 'questions'—even in droves—" *id.* at 350, the Court determines "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id*.  While commonality is less demanding than predominance, establishing commonality nevertheless requires proof the court can resolve the questions of law or fact "in one stroke." *Perisic v. Ashley Furniture Indus., Inc.*, No. 16-CV-3255, 2018 WL 3391359, at *4 (M.D. Fla. June 27, 2018). Given the highly individualized nature of their FDUTPA claims, Plaintiffs cannot meet their burden.

Under FDUTPA, Plaintiffs must show: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Deere Constr., LLC v. CEMEX Constr. Materials, Fla., LLC* (*Deere II*), No. 15-CV-24375, 2016 WL 8542540, at *2 (S.D. Fla. Dec. 1, 2016).  "While proof of actual reliance is unnecessary, the first element of a FDUTPA claim is only satisfied by evaluating a reasonable consumer in the same circumstances as the plaintiff." [7] *Id.* at *3; *see also Egwuatu v. South Lubes, Inc.*, 976 So. 2d 50, 53 (Fla. 1st DCA 2008) ("The absence of the element of reliance . . . does not guarantee that a deceptive trade practice claim will be amenable to class litigation.").

Asserting that FDUTPA's standard is purely "objective," (DE 107 at 9), Plaintiffs argue that commonality is established because the members of the putative classes were charged the same fuel and energy surcharges, respectively, and incurred price increases after receiving letters

---

[7] Like Plaintiffs' failure to assess unfair and deceptive trade practices laws in other states, they do not meet their burden to show commonality as to claims under other states' laws.

NuCO2 sent them, which allegedly falsely represented that its price increases were pass-through costs. NuCO2 contends, however, that FDUTPA has a hybrid standard that requires the defendant to engage in an act or practice that is likely to deceive a consumer acting reasonably *in the same circumstances*. (*Id.* at 25). Indeed, "[t]he modification of 'acting reasonably' by 'in the same circumstances' indicates a hybrid standard that may be <u>*objectively*</u> established as to mindset but <u>*subjectively*</u> established as to context." *In re Motions to Certify Classes Against Court Reporting Firms*, 715 F. Supp. 2d 1265, 1282 (S.D. Fla. 2010) (emphasis added); *see also Deere II*, 2015 WL 8542540, at *3. "[T]he subjective element—that the circumstances must be similar— necessitates inquiry in to the context of the alleged offense; that is, one can only assess reasonableness when the inquiry requires consideration of the factual circumstances that counsel a reasonable person to act in a particular way or hold a particular belief." *Court Reporting Firms*, 715 F. Supp. 2d at 1282.

The Court agrees with NuCO2. FDUTPA requires the Court to consider the subjective circumstances surrounding the execution of the contract to determine whether "deception" occurred. In other words, when evaluating whether a consumer was likely to have been deceived, a consumer's mindset concerning its interaction with the defendant cannot be divorced from the context in which that individual consumer understands and views that interaction.

In this case, there is nothing on the face of Plaintiffs' agreements stating that the energy surcharge does not have a profit component. *See, e.g.*, *Black's Law Dictionary* 693 (11th ed. 2019) (defining "surcharge" as "[a]n additional tax, charge or cost, [usually] one that is excessive"). In addition, there is no evidence that anyone from NuCO2 told Plaintiffs that the energy surcharge has no profit component. Indeed, Townhouse's owner confesses she has no recollection of any discussion about the agreement at all. (Ex. S, 55:5-7, 60:11-21, 63:9-65:25, 80:1-13, 82:12-14). There is, however, ample evidence that NuCO2 has explained to other members of the proposed class how the energy surcharge works and have not represented that it is a "pass-through" cost. (Ex. 1, ¶¶14-16; Ex. 2, ¶¶17-18; Ex. 3, ¶¶13-16, 23; Ex. 4, ¶¶12-16; Ex. 5, ¶¶14-16). In some cases, quite the opposite has occurred. As one TSM testified, he specifically tells customers that NuCO2 is a for-profit company and "that we do charge and make a profit on our fees." (Ex. W, 36:3-23). Moreover, and most tellingly, NuCO2 has reduced this surcharge as the result of specific negotiations with certain members of the proposed class. (Ex. 1, ¶24; Ex. 2, ¶19; Ex. 4, ¶15; Ex. 5, ¶19; Ex. 7).

Likewise, there is nothing "deceptive" on the face of Plaintiffs' agreements about open escalation price increases. These provisions grant NuCO2 the right to raise prices, but with a corresponding "check" on its right if Plaintiffs, upon proper notice, furnish proof that a competitor charges less than NuCO2. Estero Bay's general manager testified that, a decade before he terminated his relationship with NuCO2, he already understood the purpose of this type of provision. (Ex. R, 126:19-23, 127:10-128:1). Plaintiffs have not provided any evidence that anyone from NuCO2 deceived them (or any other customer) about this provision, which exists for the purpose of addressing price fluctuations in $CO_2$. Conversely, NuCO2 presented evidence that it explains the purpose of this provision to customers in various ways and sometimes makes concessions as part of the negotiation in order to keep this provision. (Ex. 1, ¶¶17-18; Ex. 2, ¶¶14-16; Ex. 3, ¶¶11-12, 23, 26-29; Ex. 4, ¶¶17-19; Ex. 5, ¶¶20-23; Ex. 7).

Plaintiffs do not offer any pathway to common "answers" that will drive the resolution of this case on a classwide basis under FDUTPA. For that reason, this case is materially indistinguishable from *Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677 (S.D. Fla. 2008).

The *Pop's Pancakes* plaintiffs brought a FDUTPA challenge to NuCO2's issuance of property tax invoices with an administrative processing fee. *Id.* at 679. They alleged that NuCO2 violated FDUTPA because NuCO2 "failed to disclose the fee, deceptively placed the fee on the invoice, misrepresented that the full amount of the property tax invoice was to be paid to a governmental agency as a 'pass-through fee,' and charged an unnecessary and excessive amount for the processing fee." *Id.* The plaintiffs listed a variety of supposedly common questions of law and fact, including issues like whether the invoice was deceptive, whether there was a profit component to the fee, and whether NuCO2 improperly represented that the fee was a pass-through charge. *Id.* at 682. NuCO2's evidence showed that its salespeople sat down with customers to explain the charges to them and that different customers were charged different fees based on "individual negotiations with the various customers, which can only be determined by reviewing the individual customer's agreement." *Id.* Furthermore, NuCO2 offered evidence that the purpose of the fee was to cover NuCO2's costs of processing and filing tax returns. *Id.*

The *Pop's Pancakes* court held that the plaintiffs had not demonstrated commonality because they "fail[ed] to state a common cause of action for each class plaintiff for deceptive practices …, as the circumstances regarding the disclosure and assessment of the full administrative processing fee could vary greatly." *Id.* As the court explained, "it is not whether

16

the class members received a property tax invoice that is the pertinent common element, but rather whether the invoice was deceptive to that particular plaintiff." *Id.* (emphasis added); *see also Marko v. Benjamin & Bros., LLC*, No. 17-CV-1725, 2018 WL 3650117, at *6 (M.D. Fla. May 11, 2018) ("The central common question . . . presents significant individual issues" requiring "inquiry into the disclosure made to each customer."); *Perisic*, 2018 WL 3391359, at *5 (claims were "hardly suitable for class treatment," where "the evidence shows that each proposed class member's sales experience was unique").

The same holds true here. Plaintiffs cannot use "common" evidence to establish "common" answers on a class wide basis that NuCO2 engaged in deception, meaning that NuCO2's actions were likely to mislead a reasonable consumer under the same circumstances. In their Reply, Plaintiffs assert that NuCO2's reliance on *Pop's Pancakes* is unfounded because unlike the defendants in that case, NuCO2 did not provide any evidence that a putative class member received a communication that contradicted the alleged deception regarding the surcharges or the open escalation fee. But again, Plaintiffs ignore that the context of NuCO2's communications with its customers includes statements and explanations provided during its negotiations with customers. By their very existence, these negotiations contradict the alleged deception at issue and undermine Plaintiffs' assertion that putative class members would be deceived into believing that these surcharges and price increases are pure pass-through fees. The Court has reviewed NuCO2's declarations and they establish that many of NuCO2's customers have successfully negotiated away, or at least reduced, surcharges. Although negotiating away the open escalation price increase is less common, customers have accepted the increase in exchange for changes to other provisions, such as the prohibition or reduction of surcharges or another provision. (Ex. 7). And as in *Pop's Pancakes*, a review of "individual negotiations with the various customers" is necessary, 251 F.R.D. at 682, and can only be determined by speaking with the TSM or customer employee involved in the tens of thousands of negotiations. Ex. 7, ¶¶5, 7, 9, 12-13. Moreover, a customer faced with a price increase had the option to find a competitive bid, which could result in a price match, rolling back the increase, or allowing the customer to depart. Thus, a price increase letter sent *after* contracting for NuCO2's services is not the only communication between NuCO2 and putative class members. The fact that customers could (and did) negotiate these surcharges and price increases, either at the outset or later via locating a competitive bid, provides crucial context that cannot be overlooked—customers may well have understood that

17

while a pass-through surcharge or price increase could not be negotiated, a profit-generating one could. NuCO2's evidence shows customers were made aware that surcharges and price increases were not solely related to its costs.[8]

NuCO2's evidence shows that its TSMs disclose and explain these contractual provisions to customers; that NuCO2 negotiates with customers about these provisions; that the energy surcharge may vary among members of the proposed class; that NuCO2 may make concessions in its negotiations in order to keep these provisions; and that the purpose of these provisions covers costs of doing business and ensures that NuCO2 is profitable. (Ex. 1, ¶¶14-18; Ex. 2, ¶¶14-18; Ex. 3, ¶¶11-16, 23, 26-29; Ex. 4, ¶¶12-19; Ex. 5, ¶¶14-23; Ex. 7).

The relevant subjective "circumstances" under FDUTPA, as indicated in NuCO2's declarations, will also include the sophistication of the individual members of the putative class, some of whom, unlike Plaintiffs, own multiple locations, have dealt with other sellers of $CO_2$, and even negotiate their contracts through attorneys. *See Court Reporting Firms*, 715 F. Supp. 2d at 1277-78 ("A class definition that includes experienced and novice users of court-reporting services necessarily includes those with differing abilities to reasonably avoid the allegedly unfair charge."); *see also Egwuatu*, 976 So. 2d at 53 (no commonality where "some of the defendants' commercial customers . . . also did business with other oil change companies," requiring an individualized inquiry). Plaintiffs' proposed classes lump together mom-and-pop family restaurants with chain restaurants, fine dining establishments, catering companies, country clubs, breweries, bars, nightclubs, convenience stores, gas stations, theatres, hospitals, medical facilities, universities, and nonprofits. (Ex. 1, ¶10; Ex. 2, ¶11, Ex. 3, ¶10; Ex. 4, ¶6; Ex. 5, ¶11). Experienced $CO_2$ users are lumped in with novices. Established businesses are lumped in with new ones. There is even evidence that the location of putative class members (i.e., rural versus city) impacts which $CO_2$ vender options are available to them, which in turn, impacts their knowledge of the differences between $CO_2$ vendors and their willingness to attempt to negotiate surcharges or price increases. (Ex. 1). The sheer range in businesses provides added context as to the "differing abilities to reasonably avoid" the alleged deception in this case.

The cases cited by Plaintiffs on commonality are distinguishable. As NuCO2 notes, most

---

[8] Thus the case that Plaintiffs' rely upon, *JWG, Inc. v. Advanced Disposal Servs. Jacksonville, L.L.C.*, No. 16-2011-CA-5641, (Fla. 4th Cir. Ct. 2015), is distinguishable as *JWG* rested upon the contention that the customers were never informed that the fees at issue had a profit component.

cases are not FDUTPA cases.[9]  As to the FDUTPA cases, in *Carriuolo v. Gen. Motors Co.*, a lawsuit over car window stickers, there was no dispute whether the class members were "in the same circumstances" for purposes of FDUTPA. 823 F.3d 977, 986 (11th Cir. 2016).  With respect to *JWG*, the contractual provision was noticeably different because it expressly stated that "fuel costs constitute a significant portion" of the defendant's costs, and allowed the defendant to "adjust for any increase in such costs or any increases in transportation cost due to changes in location of the disposal facility." *JWG*, at 1.  Thus, "the contract language in *JWG* strongly suggested a direct relationship between the fuel charge and the defendant's actual costs." *Deere II*, 2016 WL 8542540, at *5, n.2.  "Important to the court's decision [in *JWG*] was the fact the defendant failed to produce any evidence showing customers were ever made aware the fees at issue were not related to the defendant's costs." *Id.* at *5.[10]  Not so in the instant case.

Here, by contrast, there are no analogous contractual terms and Plaintiffs have produced no evidence that NuCO2 represents that its energy surcharges are "pass-through" costs and nothing more.  Contrary to Plaintiffs' allegation that the energy surcharge is <u>completely</u> unrelated to NuCO2's costs, NuCO2's corporate representative testified that the surcharge targets a profit margin over NuCO2's direct and indirect fuel costs, which are then compared against a national index. (Ex. H, 22:13-25, 26:18-28:13, 29:17-11).  NuCO2's declarations show that its TSMs communicate with its tens of thousands of customers to tell them that these are part of NuCO2's fee structure (Ex. 1, ¶¶14-16; Ex. 2, ¶¶17-18; Ex. 3, ¶¶14-16; Ex. 4, ¶¶12-13, 16; Ex. 5, ¶¶14-16), and even Townhouse's own invoices explicitly refer to the energy surcharge as a "fee."  (Ex. G). Thus, "a customer who read the contract terms, had discussions with [NuCO2's] representatives regarding the fees, and received the letters [NuCO2] sent, could have reasonably understood the fuel surcharge was not" a pass-through charge, as Plaintiffs claim. *Deere II*, 2016 WL 8542540, at *5, n.2.  Therefore, Plaintiffs have failed to carry their burden of establishing commonality.

C.    <u>Typicality</u>

---

[9]*Vega*, 564 F.3d at 1256 ("unpaid wages" and unjust enrichment); *Alderman v. GC Servs. Ltd. P'ship*, No. 16-CV-14508, 2018 WL 542455 (S.D. Fla. Jan. 19, 2018) (Rosenberg, J.) (violations of FDCPA); *Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. 602, 604 (S.D. Fla. 2003) (violations of TILA and the Florida Retail Installment Sales Act); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484 (S.D. Fla. 2003) (securities fraud); *Coleman v. Cannon Oil Co.*, 141 F.R.D. 516 (M.D. Ala. 1992) (price-fixing conspiracy).

[10]*JWG* also applied Florida's looser standards for class certification, including that courts "should resolve doubts with regard to certification in favor of certification." *JWG* at 2.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  "The typicality requirement 'measures whether a sufficient nexus exists between the claims of the named representative and those of the class at large.'" *Marko*, 2018 WL 3650117, at *7.  "'A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.'"  *Id.*  "The focus of typicality is whether the class representative's interest is aligned enough with the proposed class members to stand in their shoes for purposes of the litigation and bind them in a judgment on the merits." *Pop's Pancakes*, 251 F.R.D. at 683.  If proof of the representative's claim would not necessarily prove all of the proposed class members' claims, the representative's claim is not typical of the proposed class's claims." *Perisic*, 2018 WL 3391359, at *4; *see also DWFII Corp. v. State Farm Mut. Auto. Ins. Co.*, 271 F.R.D. 676, 687 (S.D. Fla. 2010).

Plaintiffs assert they have established typicality because the invoices and price increase letters sent by NuCO2 show that Plaintiffs' claims are based on the same legal theory and arise from the same practices as those of the putative class members.  NuCO2 contends Plaintiffs have not met their burden because Plaintiffs' claims are not typical of the claims of non-Florida putative class members in that their claims under other states' laws, if any, consist of different elements and require different proof than Plaintiffs' claims under FDUTPA and are not based on the same legal theory.  *Cohen*, 259 F.R.D. at 634.

NuCO2 further argues that Plaintiffs' claims are not typical for many of the reasons commonality is not satisfied.  In *Pop's Pancakes*, the court held the plaintiffs had not satisfied Rule 23(a)(3) because "both named Plaintiffs have claims that may be atypical of the class to the extent that the representations made to them before receiving the property tax invoice, and after receiving the invoice are different from other class members, and thus the fact that one of the named Plaintiffs may be able to prove its case, would not necessarily establish the elements necessary to prove the other class members' cases…."  251 F.R.D. at 683; *Vega*, 564 F.3d at 1277 (finding no typicality because "many class members were told about, and fully understood, how the charge back procedure worked," which "highlights the individual variation in the claims and defenses applicable to each class member").

Plaintiffs' own experiences, much of which at least one Plaintiff does not recall, say nothing about whether members of proposed classes were "deceived" under FDUTPA.  Tens of

thousands of other businesses in the proposed classes had individualized discussions and negotiations with 60 different TSMs or other NuCO2 employees.  The TSM declarations show there is no uniform way in which discussions or negotiations are held, which are often driven by questions and negotiation efforts of individual customers.  These businesses have varying levels of experience with purchasing $CO_2$ and related services, and they have engaged in varying depths of discussions and negotiations.  Plaintiffs have not shown that the interaction between Plaintiffs and NuCO2 resembles the interaction of any other putative class member with NuCO2.

As explained above, although Plaintiffs allege that Townhouse "paid the standard 'energy surcharge' in the standard amount after receiving the same standard representations as every other member" of the proposed class, (DE 107 at 21) (emphasis added) (citing Ex. G), Plaintiffs ignore the conversations and negotiations proposed class members had with NuCO2.  As she admitted, Townhouse's owner had no recollection of her discussions or negotiations with NuCO2 at the time she entered into the contract.  (Ex. S, 55:5-7, 60:11-21, 63:9-65:25, 80:1-13, 82:12-14).  Her inability to even minimally describe Townhouse's circumstances cannot establish that her claims "arise from the same . . . pattern or practice" because, with no recollection of what occurred or what was discussed, there are no facts against which experiences of putative class members can be compared or measured in order to determine if any similarity exists.

Plaintiffs allege Estero Bay "paid the standard 'fuel surcharge' in the standard amount after receiving the same standard representations as every other member" of the proposed class. (DE 107 at 21) (emphasis added) (citing Ex. G).  Yet, Exhibit G does not contain a single representation directed to Estero Bay.  In addition, both Plaintiffs' representatives admitted that while they may have received invoices, they did not recall reviewing the invoice language upon which Plaintiffs now rely.  (Ex. R, 150:17-151:6, 167:12-15; Ex. S, 161:18-162:20, 163:9-18).  Likewise, while Plaintiffs argue that "each Plaintiff received the same open escalation price increase letter," the evidence in this case undercuts their contention that each Plaintiff "was affected by the same open escalation price increase practice as every other member of the Price Increase Class," without regard to the personalized discussions and negotiations about that practice. (DE 107 at 21).  Indeed, Estero Bay was not even affected by an open escalation during the class period.  Thus, Plaintiffs' claims are not typical under Rule 23(a)(3).

D.     Adequacy

"[A] principal factor in determining the appropriateness of class certification is the

forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the members of the class." *Sanchez v. The Signal*, No. 05-CV-22259, 2007 WL 9701694, at *3 (S.D. Fla. Apr. 3, 2007) (determining that the named plaintiff was not an adequate class representative where, *inter alia*, "[h]e repeatedly testified that he could not remember many details about his interactions with [d]efendants' representatives"). NuCO2 contends that Plaintiffs are not adequate because their deposition testimony revealed that they could not say whether they ever reviewed the supposedly deceptive language on their invoices. The lack of recollection does not end there. Townhouse's owner, the one responsible for contracting with NuCO2, was unable to recall virtually anything about the circumstances regarding her negotiation and execution of the NuCO2 agreement. Relatedly, NuCO2 correctly identifies that Estero Bay is not a member of, and lacks standing to represent, the "Price Increase Class" because Estero Bay, which was only a NuCO2 customer for approximately six months during the class period, testified that NuCO2 did not increase its prices during 2015. (Ex. R, 168:24-169:19).

Plaintiffs did not address these issues in their Reply. After reviewing Plaintiffs' depositions, the Court concludes that neither are adequate representatives and Plaintiffs have failed to meet their burden of establishing adequacy.

### III.    Rule 23(b)(3)

Under Rule 23(b)(3), the movant must establish that questions of law or fact common to class members (1) predominate over any individual member's questions of law or fact and (2) that a class action would be superior to other methods of adjudication. With respect to the first requirement, predominance is "perhaps the central and overriding prerequisite for a Rule 23(b)(3) class." *Vega*, 564 F.3d at 1278. The predominance standard is "far more demanding" than commonality. *Sacred Heart*, 601 F.3d at 1175; *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997) ("Even if Rule 23(a)'s commonality requirement may be satisfied . . . the predominance criterion is far more demanding."). Thus, Plaintiffs cannot meet the predominance standard for the same reasons Plaintiffs have not met the commonality standard.[11] With respect to the second requirement, a class action is not a "superior" method for adjudication when there is a lack of predominance of class-based issues. *See Sacred Heart*, 601 F.3d at 1184 ("[T]he less

---

[11] NuCO2 advanced additional arguments in its Response why Plaintiffs' arguments under Rule 23(b)(3) fail which the Court adopts and incorporates herein.

common the issues, the less desirable a class action will be as a vehicle for resolving them."); *see also* Manual for Complex Litigation, § 21.23 (4th ed. 2004).  For these reasons, Plaintiffs have failed to meet their burden to certify a class under Rule 23(b)(3).

**CONCLUSION**

For the reasons set forth above, it is hereby **ORDERED AND ADJUDGED** that Plaintiffs' Renewed Motion for Class Certification [DE 107] is **DENIED**.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 9th day of September, 2020.

_____
ROBIN L. ROSENBERG
UNITED STATES DISTRICT COURT JUDGE

Copies furnished to Counsel of Record